UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        Case Number 16-cr-20677-06
        Honorable Thomas L. Ludington

D-6, MICHAEL ALLEN PRATT, JR.,

        Defendants.
_____/

**ORDER DENYING MOTION TO SUPPRESS EVIDENCE FROM WARRANTLESS POLE CAMERA**

On October 12, 2016, an indictment was issued which charged Michael Allen Pratt, Jr., and twelve other Defendants with participating in a large-scale conspiracy to possess and distribute controlled substances. ECF No. 16. Pratt, Jr., is charged in Count One, conspiracy to possess and distribute cocaine and heroin; Count Twenty-Six, distribution of heroin on October 26, 2015; Count Twenty-Seven, distribution of heroin on October 29, 2015; Count Twenty-Eight, distribution of heroin on November 4, 2015; Count Twenty-Nine, distribution of heroin on November 23, 2015; and Count Thirty, distribution of heroin and fentanyl, aiding and abetting.

On April 12, 2017, Pratt, Jr., filed a motion to suppress video evidence the Government obtained via a "pole camera" that was installed and operated without a warrant. ECF No. 181. On May 23, 2017, a hearing was held. For the reasons provided below and on the record, the motion to suppress will be denied.

**I.**

Most material facts are undisputed. On July 11, 2014, a fire occurred in the residence on 3253 Grant Street, Saginaw, Michigan. Prior to the fire, Pratt, Jr., his girlfriend, and their children lived in the Grant Street house. The property was owned by Pratt, Sr. Since the fire

occurred, the building has been uninhabited. On or about January 28, 2016, Pratt, Jr., rented a dumpster and began clearing portions of the damaged building.

On August 12, 2015, a "pole camera" was placed on a utility pole near the intersection of Grant Street and Youmans Street in Saginaw. The camera was positioned to record views of the front yard of the Grant Street house. It was incapable of recording any part of the interior of the house. FBI investigators were capable of accessing the camera remotely and had the ability to pan the camera right or left and zoom in. The video feed was recorded and stored on an FBI server. When first installed, the camera operated 24 hours per day. It did not have infrared capability.

Starting on approximately September 17, 2016, the camera ran from 8:00 a.m. to 8:00 p.m. Around April 12, 2016, the camera's operational schedule increased by one hour: running until 9:00 p.m. On April 20, 2016, the schedule changed to record until 10:00 p.m. Finally, on June 17, 2016, the schedule was modified so that the camera recorded from 6:00 a.m. to 11:00 p.m. The camera ceased operation on October 24, 2016.

The camera was originally installed and operated without a warrant. On February 8, 2016, investigators applied for and received a warrant to operate the camera. On May 9, 2016, and August 2, 2016, additional warrants were issued. Thus, the investigators were engaged in warrantless surveillance, via the pole camera, from approximately August 12, 2015, to February 8, 2016.

**II.**

In general, warrantless searches and seizures presumptively violate the Fourth Amendment. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants

shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. const. amend IV.

Generally speaking, the requirement that searches be reasonable means law enforcement officials must obtain a judicially approved warrant before engaging in the search. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014).

However, the Fourth Amendment does not protect defendants against all warrantless searches and seizures, simply "unreasonable searches and seizures." U.S. const. amend IV. To establish a violation of the Fourth Amendment, a defendant must show (1) a "subjective expectation of privacy" in the area searched and (2) that the expectation of privacy, viewed objectively, is reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580, 61 L. Ed. 2d 220 (1979).

**A.**

First, the Government argues that Pratt, Jr., lacks standing to challenge the search. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). Pratt, Jr., bears the burden of demonstrating standing to challenge the search, which requires that he show that he personally possessed a "legitimate expectation of privacy" in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980) (citing *Katz v. United States*, 389 U.S. 347 (1967)).[1] Importantly, "privacy interests are not coterminous with one's property rights." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 544 (6th Cir. 2003). Persons have a legitimate expectation of privacy in

---

[1] As the *Rawlings* Court recognized, the standing inquiry is fundamentally indistinguishable from the question of whether the search itself was "unreasonable." *Id.* at 106. However, the idea of "standing" is a helpful way to approach the question of whether Pratt, Jr., has a reasonable expectation of privacy in property where he no longer lived. Accordingly, that question will be analyzed separately from the distinct, though related, question of whether Pratt, Jr., may challenge as unreasonable the long-term use of a pole camera to surveil the uninhabited property.

their home, including the curtilage surrounding the house. *See United States v. Dunn*, 480 U.S. 294, 301 (1987).

But persons necessarily have a much lower expectation of privacy in uninhabited structures. *See United States v. Walsh*, 654 F. App'x 689, 704 (6th Cir. 2016) ("Jenkins failed to establish that she had a reasonable expectation of privacy in an apartment that she did not inhabit and, in fact, leased to others."); *United States v. Whitehead*, 415 F.3d 583, 588 (6th Cir. 2005) (finding that there was no reasonable expectation of privacy for a "dilapidated and unlivable" house that was used solely to engage in drug-related business transactions); *United States v. McMichael*, 369 F. Supp. 2d 898, 904 (E.D. Mich. 2005) (finding that the defendant did not have a reasonable expectation of privacy in a house that was used solely to conduct a business and which was "devoid of Defendant's personal effects, or any personal effects at all"); *United States v. Jefferies*, No. CRIM.A. 3:07CR25-S, 2008 WL 90025, at *1 (W.D. Ky. Jan. 8, 2008) ("Simply leasing a premises and possessing a key does not create a reasonable expectation of privacy which society is willing to recognize as reasonable where the evidence shows that the location was used solely for conducting illicit business.").

Similarly, property used for commercial (or illegal)[2] purposes is treated differently than property used for residential purposes. *Minnesota v. Carter*, 525 U.S. 83, 90 (1998). A worker can have a reasonable expectation of privacy in his workplace (and especially in a private office). *Id.* But the more tenuous connection between the person and the property (especially if the person is present on the property solely to engage in commercial activity), the less reasonable the defendant's expectation of privacy.

---

[2] Importantly, the use of a space for illegal activity does not alter the privacy expectations of a person who would otherwise have standing." *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009).

Here, Pratt, Jr., concedes that the building was uninhabited. It is further undisputed that he did not own the property. Although property rights are not required to establish a reasonable expectation of privacy, they are relevant. Pratt, Jr., contends that he had some personal effects still within the structure, but it was clearly no longer being used for residential purposes. Pratt, Jr., did rent a dumpster and clean out part of the house on January 26, 2016, but that activity, if anything, serves to emphasize that Pratt, Jr., no longer lived at the Grant Street property. The Government presumably will assert at trial that Pratt, Jr., used the property as a location for illicit activity related to the narcotics conspiracy. But, as explained above, the periodic use of property for commercial purposes is not typically sufficient to create a reasonable expectation of privacy.

The immediate case is more analogous to *McMichael*. In *McMichael*, the defendant was present on the premises in order to package cocaine. The district court explained that this was "essentially . . . a business transaction." 369 F. Supp. 2d at 903 (internal citations omitted). In finding that the defendant did not have a reasonable expectation of privacy in the apartment, the court reasoned as follows:

> [H]e had no personal effects in the residence, unlike an overnight guest or resident. Additionally, unlike *Carter*, the McGuire house was not used as a residence by anyone; there was no furniture, no personal effects, and the humidity and conditions of the house were not suitable for habitation. Furthermore, Defendant took steps to distance himself from the property by ensuring that his name was not on documentation associated with the residence. Morea also repaid Defendant's interest in the house and the house would have belonged to Morea after the completion of the operation. Finally, the entire purpose of the house as presented to the Court was for an illegal marijuana growing operation; there was no legitimate residence.

*Id.*

Likewise, in *Whitehead*, the Sixth Circuit found that a person illegally squatting in a dilapidated house did not possess a legitimate expectation of privacy in the property. 415 F.3d at 587. More importantly, the court found that a frequent visitor to the property did not have a legitimate

expectation of privacy because "he never once slept at the residence," the "house was dilapidated and unlivable," and the visitor presented no evidence which indicated that he visited the property for any purpose other than engaging in drug-related business transactions. *Id.* at 588.

It is undisputed that the structure was not suitable for habitation. Pratt, Jr., did not own the property and, more importantly, had lived elsewhere for over a year. In fact, it appears that Pratt, Jr.'s, only remaining connection to the Grant Street property is the alleged drug-related activity he conducted there. Considering the tenuous relationship between Pratt, Jr.'s, personal life and the uninhabited Grant Street property, he did not have a reasonable expectation of privacy for activity conducted on the property.

**B.**

Even if the Court concluded that Pratt, Jr., had sustained a sufficient connection to the property to maintain his privacy protections, the surveillance method used by the investigators did not violate a reasonable expectation of privacy. Continuous camera surveillance of private property does raise privacy concerns and is evocative of an "Orwellian state." *See United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987). But there are mitigating factors and controlling precedent which justify denial of the motion to suppress here.

Pratt, Jr., correctly notes that federal courts have consistently expressed discomfort with long-term video surveillance of defendants. In *United States v. Cuevas-Sanchez*, for example, the Fifth Circuit acknowledged that a "camera monitoring all of a person's backyard activities . . . provokes a negative visceral reaction." 821 F.2d at 251. The *Cuevas-Sanchez* Court concluded that "Cuevas's expectation to be free from this type of video surveillance in his backyard is one that society is willing to recognize as reasonable." *Id.*[3] And, in an unpublished decision, the Sixth

---

[3] Despite that conclusion, the *Cuevas-Sanchez* Court affirmed admission of the video evidence because investigators had properly obtained a court order prior to beginning the video surveillance. *Id.* at 252.

Circuit opined that "long-term video surveillance of curtilage" might require a warrant. *United States v. Anderson-Bagshaw*, 509 F. App'x 396, 405 (6th Cir. 2012).

But more recent decisions have declined to suppress evidence obtained from long-term video surveillance when the camera captures a public view. In *United States v. Wymer*, the district court denied a motion to suppress video surveillance evidence from a camera aimed at the defendant's garage, despite "concerns regarding the intrusive nature of the surveillance at issue." 40 F. Supp. 3d 933, 942 (N.D. Ohio 2014). The court emphasized that "any passerby on Sterling Street would have an unobstructed view of the property through the chain-link fence. The same passerby would have perhaps an even better look at the garage from the Sterling Street driveway." *Id*. Because the defendant "knowingly expose[d] his garage to public view," he could not claim a legitimate expectation of privacy "in his activities at the garage." *Id.* at 940. *See also United States v. Garcia-Gonzalez*, No. CR 14-10296-LTS, 2015 WL 5145537, at *9 (D. Mass. Sept. 1, 2015) (reluctantly following First Circuit precedent and finding no Fourth Amendment violation where the video surveillance was of property exposed to the public, but asserting that "continuous surveillance" is highly intrusive and deeply troubling); *United States v. Houston*, No. CRIM.A. 3:13-09-DCR, 2014 WL 259085, at *5 (E.D. Tenn. Jan. 23, 2014) (reasoning that long-term video surveillance likely violated the defendant's reasonable expectation of privacy, but declining to create a bright-line rule and finding that exclusion was not warranted regardless).

But notwithstanding the concerns expressed by other federal courts (and shared by this Court), the Sixth Circuit's recent decision in *United States v. Houston* compels denial of the motion to suppress. 813 F.3d 282, 288 (6th Cir.), cert. denied, 137 S. Ct. 567, 196 L. Ed. 2d 448 (2016). In *Houston*, the Sixth Circuit held that warrantless video monitoring, which occurred for

ten weeks, was not a violation of the Fourth Amendment. The *Houston* Court summarized its reasoning as follows:

> There is no Fourth Amendment violation, because Houston had no reasonable expectation of privacy in video footage recorded by a camera that was located on top of a public utility pole and that captured the same views enjoyed by passersby on public roads. The ATF agents only observed what Houston made public to any person traveling on the roads surrounding the farm. Additionally, the length of the surveillance did not render the use of the pole camera unconstitutional, because the Fourth Amendment does not punish law enforcement for using technology to more efficiently conduct their investigations. While the ATF agents could have stationed agents round-the-clock to observe Houston's farm in person, the fact that they instead used a camera to conduct the surveillance does not make the surveillance unconstitutional.

*Id.* at 287–88.

The fact that the camera might have captured images of Houston's curtilage was irrelevant because the views were plainly visible to the public. *Id.* at 288. The court also emphasized that "it was possible for law enforcement to have engaged in live surveillance of the farm for ten weeks." *Id.* at 289. And, anticipating an objection, the court further reasoned that "even if it were not practical for the ATF to conduct in-person surveillance for the full ten weeks, it is only the possibility that a member of the public may observe activity from a public vantage point—not the actual practicability of law enforcement's doing so without technology—that is relevant for Fourth Amendment purposes." *Id.*

*Houston* is controlling here. Pratt, Jr., concedes that the view captured by the pole camera was "open to public view." Mot. Suppress at 4. Pratt, Jr., does not attempt to distinguish *Houston*. Rather, he argues simply that the length of the warrantless surveillance rendered it unreasonable. But *Houston* directly addresses and rejects that argument. The investigators here would have been legally justified in personally staking out the property for several months. Accordingly, they were permitted to use a camera to accomplish the same thing. Further, the

camera in *Houston* was trained on the defendant's residence. Since the Grant Street property was not being used for residential purposes, the surveillance here is significantly less troubling.[4] Thus, because the property here was nonresidential and the recordings were of a view available to the public,[5] Pratt, Jr., did not possess a reasonable expectation of privacy in the video footage captured by the pole camera. The motion to suppress will be denied.

**III.**

Accordingly, it is **ORDERED** that Defendant Pratt, Jr.'s, motion to suppress, ECF No., 181, is **DENIED.**

Dated: June 2, 2017                        s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 2, 2017.

s/Kelly Winslow
KELLY WINSLOW, Case Manager

---

[4] Pratt, Jr., also raises an additional concern regarding the possibility that the camera had the capability of "zooming in or panning images." Mot. Suppress at 4 n. 1. The Government represents that the camera had those capabilities. Resp. Br. at 2, ECF No. 246. But the camera in *Houston* had the same functionality. See 813 F.3d at 286. Thus, *Houston* cannot be distinguished on that ground.

[5] Pratt, Jr., admitted at the hearing that the camera had no line of sight into the interior of the house.